Smith vs. Bryan.

Matthew Smith, plaintiff in error, vs. Seaborn C. Bryan, defendant in error.

[1.] A bill in equity to set aside a sale of land, and cancel the deed on the ground of fraud, is not a "case respecting title to land" by intendment of the 5th clause, 2d section, 4th article of the Constitution of Georgia, and the Superior Court of the county in which the land lies has no jurisdiction in such case, if the defendant reside in a different county.

[2.] A bill for relief and injunction, having equity on its face, will not be dismissed without a hearing, even though the answer deny all the equity.

[3.] In such cases, the dissolution of the injunction is a matter in the discretion of the Court. And if the answer leave undenied any equity apparent in the bill, and the injunction be only to prevent sale and waste of land in question, *pendente lite*, the injunction may properly be retained.

In Equity, in Lee Superior Court. Motion to dissolve Injunction and dismiss Bill. Decided by Judge Richard H. Clark. At Chambers, October, 1864.

Smith filed his bill against Bryan in Lee Superior Court, returnable to September Term, 1864. Bryan did not reside in Lee, but in Macon county, and this fact appeared on the face of the bill; and upon it, the defendant denied the jurisdiction of the Court. He presented that defence at the first term, both by demurrer and by plea. He, also, at the same time filed his answer to the allegations of the bill; indeed, all the modes of defence were comprehended in the same instrument: the first part being a demurrer to the jurisdiction; the second, a plea to the jurisdiction; and the third, an answer to the merits.

Upon these pleadings, and certain affidavits read in support of the allegations of the bill and answer, respectively, the cause came up for decision before Judge Clark, at Chambers, on a motion made by defendant to dissolve the injunction and dismiss the bill. The grounds of the motion were: 1st. Want of equity in the bill; 2d. Want of jurisdiction in the Court; 3d. That the equity of the bill, if any, had been sworn off. His Honor, Judge Clark, held that there was

equity in the bill, and that the same was not sworn off, but ordered the bill dismissed for want of jurisdiction.

The parties then agreed, in writing, to bring before the Supreme Court, in a joint bill of exceptions, the whole motion decided by Judge Clark, which they did accordingly—the complainant excepting to the ruling touching jurisdiction, and the defendant to that touching the equity. They further agreed "to go to trial in the Supreme Court on the merits of the bill, answer, and affidavits."

THE BILL made the following case:

On the 15th of July 1863, complainant sold to the defendant his homestead and plantation, situate in the county of Lee, for $16,000.00, payable the 1st of January, 1864, in Confederate money, and conveyed the same to him by deed. While the negotiations were in progress, complainant told the defendant that if he sold the premises he wished to invest the proceeds in negroes for his children; and the defendant desiring, if he purchased, to divide the price into two payments: the complainant offered to gratify him upon condition, that the last payment should be in good money—not Confederate money. The defendant thereupon proposed that if complainant would take the whole price in Confederate money, he would give his note for it, payable in that currency, making it all due on the 1st of January, 1864; and, moreover, that if complainant would execute the deed at once, he would pay the note promptly at maturity—complainant telling him expressly that if he sold the land for *all Confederate money*, payment must be promptly made on the 1st of January, 1864, so as to enable him to invest as before mentioned—accepted the terms proposed, and the contract was closed accordingly, the defendant reiterating his promise to pay promptly.

In performance of this contract, the deed was made and delivered at the time of the sale. It was written by James Morgan, and complainant suggested that the same person should write the note also; but defendant saying that he could write it before Morgan got ready, wrote off and signed

it, and after going through the form of reading it to complainant, he handed it to him; and he, without knowing anything of its contents, except as read over to him by defendant, took and accepted it. The note, as read out by defendant, corresponded precisely to the terms of the contract; that is, was for $16,000.00, payable on the 1st of January, 1864, in Confederate money; but as actually written and delivered, it contained the superadded words, "or bonds," enlarging the medium of payment from Confederate money only, to Confederate money or bonds. These words the defendant fraudulently inserted, and knowingly, and designedly suppressed in the reading; and the complainant, in utter ignorance of their insertion, accepted the note and executed the deed. And he never discovered the true phraseology of the note until near the following Christmas, when his step-daughter, in looking over his papers, noticed and informed him of it.

The note was not paid at maturity; and about the time it became due, defendant informed complainant that he would not pay for the premises until he obtained possession of them. Complainant refusing to surrender possession, the defendant promised him that as soon as the possession was yielded, he would pay every dollar in Confederate money. Complainant thereupon, confiding in this promise, moved out, and as soon as the defendant got possession he refused to pay, saying he had no money.

This refusal was persisted in until after the passage by Congress of the late currency bill depreciating Confederate money, so as to make three dollars worth but two; and even after the passage of that bill, no tender was ever made of the whole amount due; nor any amount whatever, (as complainant was advised.) The defendant, however, in company with Seaborn Moore, came to the complainant on the — day of March 1864, and said he wanted to pay $10,000.00 in the old issue at par. He had with him something rolled up in a paper which he said was $6,000.00, and he said that Moore had a package of $3,000.00; but no money was actually shown

or exhibited—not a dollar. Complainant offered to receive the *whole* amount at 33⅓ per cent. discount, but this basis of settlement the defendant declined.

Two payments, only, were ever made on the note; the first of $10,000, paid in Confederate money on the same day the note was executed, and entered thereon as a credit under that date; the second, of $126, paid in syrup and oats, on the 1st of January, 1864, and entered as a credit under date of February 20th. The aggregate of these payments, with interest thereon, the complainant offered by his bill to repay to defendant, or deposit in Court. He offered to surrender the note itself.

The lands had appreciated since the sale, to the value of $35,000, or other large sum. They were valuable, not for agricultural purposes only, but, lying contiguous to a railroad, for timber, and lumber also. The defendant was still in possession, and being a trader and speculator, the complainant feared he would cut, sell, and carry off the timber and lumber, and that he would sell and convey the premises themselves to some *bona fide* purchaser without notice.

Complainant was an aged, infirm, blind, and illiterate man. He could scarcely see anything, and had never gone to school a day in his life. Of his disability, consequent upon these things, the defendant took advantage to impose upon him a note fraudulently written and falsely read. He was unable to read it for himself, and had he been aware that it contained the words, " or bonds," he would neither have accepted it nor have made the deed. He had known the defendant for forty years, and in him he reposed the utmost trust and confidence; he relied most implicitly upon his representations and promises; he confided thoroughly in his good faith, truth, and integrity. In the exercise of this unreserved confidence, he agreed to make, and did make the deed, upon defendant's promise to pay promptly; without which promise and his trust in it, he would not have executed the deed, and this the defendant well knew. The same confidence led to the acceptance of the note, without doubt or

suspicion, upon the reading of it by the defendant. Finally, though the previous abuse of it in drafting and reading the note had then been discovered, confidence was again extended to defendant's promise, and he was let into possession upon his undertaking to pay the debt as soon as the possession was surrendered.

All this confidence was met by the defendant with fraud. By a fraudulent promise he procured the deed ; by a fraudulent insertion in the note, he made it vary from the contract ; by a fraudulent reading of the note, he induced its acceptance in that form ; and by a second fraudulent promise, he obtained possession of the premises.

Besides the usual prayers for *subpœna* and general relief, the bill prayed specially for the cancellation of the deed ; for the restitution of possession, with an accounting for rents ; for a complete annulling and rescinding of the contract; and for an injunction to restrain the defendant from cutting, felling, or hauling off the timber or lumber, and from bargaining, selling or conveying the lands themselves, or any part or parcel thereof.

There was no prayer for discovery, but, on the contrary, any answer from the defendant was expressly waived.

The bill was verified by the oath of complainant on the — day of April 1864, and on the 28th of May following, it was sanctioned, and the injunction ordered.

The Answer admitted the purchase at the price alleged, due at the time specified ; the writing of the deed by Morgan ; its delivery at the time of the purchase ; the writing of the note by defendant, and the reading of it over by him to the complainant. It stated that defendant had no recollection of complainant's wishing Morgan to write the note, or of the remark consequent thereupon as charged. It denied that complainant mentioned any purpose to invest in negroes, or that he exacted good money for the last payment ; his assent to two payments being attended simply with the requirement of interest upon the first from January 1st,

1864. It averred that defendant expressly stipulated for paying in Confederate securities; and that before the contract was closed, both parties agreed upon one payment, and that it should be made in Confederate securities. It denied the alleged promise to pay promptly, and affirmed that defendant said, that if it should turn out inconvenient to pay all when due, he would like indulgence on the balance, and that complainant expressed a willingness to grant it. It stated, that with this understanding, and no other, the deed was made; that the consideration was $16,000 in Confederate money or securities; not in Confederate money only; that the note was given as agreed upon, and read to complainant precisely as written, without suppressing the words " or bonds; " that on the reading of these words, the complainant said he did not like bonds, to which the defendant replied that he would strike it out, and took up the pen to do so, when complainant immediately added, that he supposed if the money was good the bonds would be good; that taking this as an assent to the note in its original form, he let it stand with the words (as he remembered,) only partially obliterated; that defendant had no motive for inserting the words but to comply with the contract; and that he would have preferred them omitted, because, to procure bonds would have subjected him to trouble and expense.

The defendant denied the fraud and deception imputed to him, and declared himself unable to see how he could wrong, injure, or defraud complainant by granting him more favorable terms and conditions than those asserted in the bill as the true stipulations. He knew nothing of the alleged discovery by complainant's step-daughter.

He admitted that he did not pay the note at maturity; but denied that he declined doing so then, or at any other time, for the reason alleged in the bill, or that complainant, about the 1st January 1864, refused to give him possession until the money was paid, or that he did then, in order to obtain possession of the land, enter into any new contract, or make any new promise, or that after getting

possession, he refused to pay the money.   He did not get possession until about the last days of January; and during that month, owing to the unreasonable conduct and bad faith of complainant in refusing to comply with his contract, defendant lost the work of about twenty negroes, set apart to work the place.

He alleged, that previous to December 1863, hearing of some adverse claims to a portion of the land, and that one of them was in suit, he inquired of complainant why he had neglected to inform him of these claims; that complainant replied, he (complainant) knew of them—that he had the warranty of John T. Brownforth, and that he did not wish defendant to pay the $4,000, the estimated value of the portion in dispute.

He further alleged, that on or about the 22d of February 1864, he proposed to pay on his note $4,000 in Confederate money, and counted out the same to complainant, who refused to receive it, because not the full amount due, saying, however, that he would receive the whole sum if defendant would bring it; that, thereupon, on the 2d of March thereafter, in the presence of Seaborn Moore, defendant tendered him the whole sum, to-wit, $15,000, or thereabouts, in Confederate Treasury notes, and that the complainant refused to receive it unless at a discount of one-third off.

He admitted the credits on the note, and that they arose and were entered as charged.

He admitted the appreciation of the lands; his possession of them; their proximity to a railroad; their value for agricultural purposes, and their having upon them much good timber and lumber.   He admitted that he made trades, but averred that he did not purchase these lands on speculation, but for use; and he denied any intention to sell them or to commit waste.   He submitted that no act of waste was charged by the bill, nor any act of his alleged, going to show an intention to sell the lands, nor was his insolvency or inability to respond in damages alleged; he, therefore, invoked

the judgment of the Court, whether the injunction ought at first to have been granted, or should now be held up.

He admitted that complainant was quite aged, and had defective vision, but averred that he was not blind; and that, although not very learned, he was not wholly illiterate, but able, as defendant remembered, to read both print and writing. Of his early education, or whether he ever went to school a day or not, defendant knew nothing. Defendant had once lived in his family, and for forty years had been well known to him, and may have had his confidence; he was unconscious of having done anything to forfeit that confidence.

The Affidavits read by complainant were, 1st, that of James Morgan, who stated that he drew the deed, and was then called on to write the note, but did not. Defendant wrote it, making it payable in Confederate Treasury notes or bonds, and if he read it over to complainant witness did not remember it.

Sworn to, Oct. 3d, 1864.

2d. That of Dupree Peacock, who stated he was present when defendant, about 25th December 1863, remarked to complainant, that he understood he would not give possession of his farm until he paid for it. Complainant said it was so. Defendant replied that he would not pay him a dollar until he did give possession.

Sworn to, Oct. 3d, 1864.

3d. That of Wm. Bryan, who stated that about the last of January 1864, complainant proposed to give the defendant immediate possession of his farm on condition of being paid for it. Thereupon they agreed, and defendant promised to pay him every dollar he owed him when he gave possession.

Sworn to, Oct. 4th, 1864.

4th. That of T. C. Brown, who stated that he had a conversation last spring with James Morgan, who said he wrote the deed; that he went in to get a form to write by, and while gone, he heard the defendant remark, " I

can do the writing before Morgan can get ready;" that defendant wrote the note, and while he was writing it, he (Morgan) looked over his shoulder and saw the note; that he thought to himself, *he* would take no such note, and if it was read in complainant's presence he did not remember it. Witness, from having to do complainant's reading and writing himself, and from his declarations, believed him unable to read or write, except that he had learned to sign his name mechanically.

Sworn to, Oct. 3d, 1864.

The only affidavit read by defendant, was that of James Morgan, (sworn to, September 9th, 1864,) who, in that affidavit, stated that he wrote the deed; that complainant was to take defendant's note, payable in Confederate notes or bonds; that the note was written in that way, and contained the contract just as witness understood it; that complainant made no objection, but took it, looked at it, and, as witness supposed, read it, and said it was all right.

The case was submitted on the briefs of counsel.

SCARBOROUGH, for plaintiff in error.

HALL, for defendant.

*By the Court.*—JENKINS, J. delivering the opinion.

Defendant, in the Court below, moved to dismiss the Bill, first, for want of jurisdiction in the Court, and, secondly, for want of equity in the Bill.

He also moved to dissolve the injunction, on the ground that the equity of the Bill had been removed by the answer in direct response to it. The Court below dismissed the Bill upon the first ground, but expressed the opinion that there was equity in the Bill, which had not been sworn off. To the first portion of his ruling the complainant excepted, as did the defendant to the last.

[1.] Had the Superior Court of Lee County jurisdiction

in this case? The complainant affirms that it had, and places the jurisdiction upon a provision of the Constitution, in the first clause of section 4,977 of the Code, in these words: "The Superior Court shall have exclusive jurisdiction in all cases respecting titles to land, which shall be tried in the County where the land lies."

The defendant denies the jurisdiction, and rests his denial upon a provision of the Constitution contained in the last clause of the same section, and immediately following that above quoted, in these words: " And, also, in all equity causes, which shall be tried in the county, where one or more of the defendants reside, against whom substantial relief is prayed. "

It is alleged, in the Bill, that the land, the sale of which is the matter in controversy, lies in the County of Lee. What, in intendment of the Constitution, are " cases respecting titles to land?" We understand them to be, cases in which the plaintiff asserts his title to the land in question, and depends for a recovery upon his maintenance of it; or to supply a link in the chain, wanting by reason of accident or other cause. In order to determine whether or not a plaintiff at Law or a complainant in Equity, who selects his forum upon this clause of the Constitution, has made a case of jurisdiction for the selected Court, it is necessary to examine carefully, his allegations. What then is the gravamen in this case? Is it that at the time of filing this Bill, the complainant had title to the lands, and that the defendant held possession, or committed waste, or did any other act, respecting them, without his consent, and in derogation of his title? Not at all. On the contrary, he alleges, that on, and previous to, the 15th day of July, A. D. 1863, he had title to, and was possessed of them; that on that day, for a consideration stated, he bargained and sold them to defendant, and executed to him, in due form of law, a deed for the same; and that, at a subsequent time, he delivered to the purchaser the possession, under and by virtue of that sale. In other words, that he had voluntarily passed to the defendant

by proper legal conveyance, whatever of title thereto, previously abode in him. The allegations, put out of view all question of title in the case. They are made simply as inducement to other allegations which constitute the grievance set forth, and upon which his prayer for relief is founded. They amount, briefly stated, to this, that by reason of certain fraudulent practices of the defendant, at the time of the conveyance, and at the time he was put in possession, and since, complainant is entitled, upon principles of equity jurisprudence, to have the contract set aside, the deed cancelled and the possession of the land restored to him; and such is his prayer. His case is not that the title never legally passed from him, nor that it has legally returned to him. His prayer is not that his title, under existing circumstances, may be adjudged good and valid, but that by reason of certain facts, dehors the title, the contract which divested him of it may be annulled, and it restored.

The case, then, does not respect title to lands, but is respecting a contract in relation to them, and certain fraudulent practices, which, it is, alleged, vitiate that contract. It follows that the character or nature of the case does not give jurisdiction to the Superior Court of Lee County.

It also appears by the Bill, that the defendant resides not in the County of Lee, but in the County of Macon, in this State, which, under the last clause of the section quoted above, fixes the proper jurisdiction in Macon County, and of course the Superior Court of Lee county can take no furthe recognizance of the case.

[2.] The second point, which brings under consideration the merits of the case, is to be considered without reference to the answer. It is in the nature of a general demurrer for want of equity, and must be decided upon complainant's allegations. The answer may so far remove the equity of a Bill, as to relieve the defendant of an injunction, but the complainant has unquestionably the right to proceed, and establish his case, by *aliunde* proof, if he can, without going

at length into the case. I shall briefly mention certain alleged facts, which seem to call for equitable interposition.

These are, that the note representing the consideration for the land was not drawn according to the contract, but a medium of payment, not being a legal tender, and not agreed upon, was surreptitiously inserted, as expressly stipulated, and the note, thus written, was first falsely read to an illiterate, pur-blind, old man, and then delivered and accepted in ignorance of its contents; that the defendant made his purchase to depend upon complainant's receiving in payment, the treasury notes of the Confederate Government, and asked credit for eighteen months or more, on one-half of the sum; that complainant refused to give credit for any portion of it, beyond the first of the ensuing January, unless such portion were paid "in good money, not in Confederate notes;" but agreed to receive payment of the whole, in Confederate notes, *if paid promptly on the first of January*, thus, with good reason (as subsequent events proved) making *time*, of the essence of the contract; that defendant not only agreed to make that the time of payment on the face of the note, and did so make it, but gave a personal pledge of promptness in observance of the time; that on the first of January he failed to pay, and (complainant refusing to deliver possession) afterwards promised to pay the whole in Confederate notes, upon receiving possession; that complainant, having upon the faith of this new promise, placed him in possession, he again refused, or failed to make payment; that he never tendered payment until after the passage of an act of the Confederate Congress, which had the effect of at once reducing the value of that currency as a circulating medium, one-third, which enabled him to procure funds for the payment of complainant, at this reduced value, and made it impossible for the latter (should he receive them, as tendered, at their nomininal value) to realize the consideration for which he had bargained and sold his land; that complainant offered to receive those notes, then, at their statutory and market depreciation, which offer was rejected. If our proposition, that the

allegations make *time* of payment an essential part of the contract be correct, this, considered in connection with the alleged contrivances and devices to obtain possession on or near the first of January 1864, and still postpone payment until the stipulated medium became greatly depreciated, as currency, it must be conceded that there is equity in the Bill. How far the complainant may be able to support his allegations, or, if successful, to what relief he will be entitled, we are not now called upon to consider; we decide only that he is entitled, by his showing, to a hearing.

[3.] Did the defendant's consider; entitle him to a dissolution of the Injunction? It denies any personal pledges, outside of the note itself, as to prompt payment at the time therein specified. It denies other allegations which go to show that time was of the essence of the contract. It denies that possession was obtained on the first of January, and payment still postponed by devices and contrivances. But it does not deny what, indeed, appears upon the face of the note, that payment was to be made on the first of January, in a currency not in itself (apart from express stipulation) a legal tender, and not based upon a specie or other intrinsically valuable foundation. It admits that full payment in this currency was not tendered until two months after the time of payment, nor until some two weeks after it had been depreciated one-third of its nominal value. That this medium, from its peculiar character, independently of the effect of positive legislative enactment, was eminently liable to depreciation; that it was issued and circulated from hand to hand, with anxious foreboding, under the pressure of necessity, is perfectly notorious, and hence, that an obligation to pay in it, *at a specified time*, was especially binding, is apparent. These considerations invest the case with an equity that has not been, and cannot be, sworn off. The injunction goes no further than to restrain the defendant from selling the land and from waste, *pendente lite*. The possession and ordinary use and enjoyment of it are not disturbed. A Court of Equity has discretion, under peculiar circumstances,

to retain an injunction, even when the equity of the Bill is sworn off.—*Ga. Decisions pt.* 2. 15, 8, *Ga. R,* 444. In this case, had the Court had jurisdiction, we think the injunction might have been retained.

The judgment is affirmed.